408 F.Supp.2d 1055 (2005)
In re: WESTERN STATES WHOLESALE NATURAL GAS ANTITRUST LITIGATION,
And All Related Cases.
Fairhaven Power Company, Plaintiff,
v.
Encana Corporation, et. al., Defendants.
Abelman Art Glass, On Behalf of Itself and All Others Similarly Situated, Plaintiff,
v.
Encana Corporation et. al., Defendants.
Utility Savings & Refund Services, et al., Plaintiffs,
v.
Reliant Energy Services, Inc., et al., Defendants.
No. MDL 1566, Nos. S-1431-PMP PAL, S-05-0243-PMP PAL, S-05-0437-PMP PAL, S-05-0110-PMP PAL.
United States District Court, D. Nevada.
December 19, 2005.
*1056 *1057 Craig C. Corbitt, Zelle Hofmann Voelbel Mason & Gette, LLP, Francis O. Scarpulla, Francis O Scarpulla, Law Office of, San Francisco, CA, J. Bruce Alverson, Alverson Taylor Mortensen, et al, Las Vegas, Josef D. Cooper, Cooper & Kirkham, PC, Michael P. Lehmann, Furth Firm, LLP, San Francisco, CA, Nathan Reinmiller, Alverson Taylor Mortensen, et al, Las Vegas, William T. Needham, Janssen Malloy Needham, et al, Eureka, CA, for Fairhaven Power Co., Plaintiff.
William H. Johnson, Hogan & Hartson, Washington, DC, John L. Hendricks, Akin Gump Strauss Hauer & Feld, Dallas, TX, Heather R. Skinazi, Sidley Austin Brown & Wood, LLP, Joshua D. Lichtman, Fulbright & Jaworski, Los Angeles, CA, Joel B. Kleinman, Dickstein, Shapiro, Morin & Oshinsky, Washington, DC, Michael J. Kass, Pillsbury Winthrop, Diane E. Pritchard, Morrison & Foerster, San Francisco, CA, Robert A. Sacks, Sullivan & Cromwell, Los Angeles, CA, Mark R. Robeck, Baker Botts, LLP, Houston, TX, Richard P. Levy, Gibson Dunn & Crutcher, Alan Z. Yudkowsky, Stroock Stroock & Lavan, Los Angeles, CA, Stanley J. Panikowski, DLA Piper Rudnick Gray Cary U.S. LLP, San Diego, CA, David T. Peterson, Morgan Lewis & Bockius LLP, Los Angeles, CA, for AEP Energy Services, Inc., American Electric Power Service Corporation, Centerpoint Energy Inc., CMS Energy Corporation, Coral Energy Resources, LP, Duke Energy Corporation, Duke Energy Trading & Marketing, LLC, Dynegy Holding Co., Inc., El Paso Corporation, Encana Corporation, Reliant Energy Services, Reliant Resources, Inc, Sempra Energy Corp., Sempra Energy Trading Corp., WD Energy Services, Inc., West Coast Power LLC, Williams Companies, Inc., Xcel Energy Inc., Defendants.

ORDER
PRO, Chief Judge.
I. BACKGROUND
This case arises out of the 2000-2001 California energy crisis. During that time, the California energy and natural gas markets became mutually dysfunctional, and, feeding off each other spiraled into a state-wide energy crisis. Amendments to Blanket Sales Certificates, 68 Fed.Reg. 66323, 66325 (Nov. 17, 2003) (to be codified at 18 C.F.R. § 284.288) ("Order 644"). The Federal Energy Regulatory Commission ("FERC") undertook a fact finding investigation of the market crisis in which it concluded, "[S]pot gas prices rose to extraordinary levels, facilitating the unprecedented price increase in the electricity market." Id. FERC concluded the dysfunctions in the natural gas market stemmed from efforts to manipulate price indices compiled by private trade publications, including reporting of false data and wash trading.[1]
*1058 Plaintiff Fairhaven Power Company ("Fairhaven") is a California state corporation, with its principal place of business in California. (Am. Compl. at 4.) Fairhaven purchased natural gas in California for the purpose of consumption, not resale. (Id.) Plaintiff Abelman Art Glass ("Abelman") is a sole proprietorship, for its principal place of business in California. (Id.) Abelman purchased natural gas in California with the purpose of consumption, not resale. (Id.) Plaintiff Utility Savings & Refund Services, LLP ("Utility Savings") is a power cooperative located in California. (Id.) Utility Savings purchased natural gas for the purpose of consumption, not resale. (Id. at 4-5.) Consumers of wholesale natural gas that buy gas for consumption, and not for resale, are typically referred to as "end-run users."
Plaintiffs filed suit against Defendants seeking to recover damages on behalf of natural gas rate payers. In the Amended Complaint, Plaintiffs claim Defendants violated the Sherman Act, 14 U.S.C. § 1, the Cartwright Act, and California Unfair Competition Laws, Cal. Bus. & Prof.Code § 17200. (Am.Compl.) Plaintiffs allege Defendants engaged in false reporting of natural gas prices, participated in wash trades, including Enron Online ("EOL") facilitated wash trades, entered into illegal netting agreements,[2] and conspired to not compete in natural gas markets. (Id.)
Additionally, Plaintiffs allege the El Paso Defendants entered into an illegal netting agreement engineered to "churn," or artificially raise, natural gas prices. (Id. at 31.) Plaintiffs further allege the El Paso Defendants met at a hotel in Phoenix and agreed to not compete with regard to two separate pipeline projects. (Id. at 43-44.) The Multi District Litigation Panel transferred these cases to this Court for coordinated and consolidated proceedings. (CV-S-05-1110, Doc. # 11; CV-S-05-0243, Doc. # 40; CV-S-05-0437, Doc. # 7.)
Plaintiffs request relief for claims one through five as follows:
H. Awarding treble the amount of actual damages determined to have been sustained by Plaintiffs and the Class as a result of the conduct of Defendants complained of herein as provided by law, and that judgment be entered against each Defendant for the amount so determined;
I. Awarding to Plaintiffs and the Class statutory damages, punitive or exemplary damages, attorneys' fees, costs and disbursements;
J. Awarding to Plaintiffs and the Class pre- and post-judgment interest to the extent allowed by the law;
K. Awarding to Plaintiffs and the Class equitable relief, including a judicial determination of the rights and responsibilities of the parties in all practicable injunctive relief;
L. Awarding to Plaintiffs and the Class equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have unjustly enriched *1059 Defendants as a result of their wrongful conduct;
M. Order that a constructive trust be imposed on the assets of all Defendants and the proceeds from the sale of any of those assets; and
O. Awarding to Plaintiffs and the Class costs of suit and such other and further relief as the Court may deem just and proper under the circumstances.
(Am. Compl. at 67-68.)
Plaintiffs' sixth claim for relief alleges the El Paso Defendants and Sempra Defendants violated section 1 of the Sherman Act. (Id. at 64-65.) In Plaintiffs' seventh claim for relief Plaintiffs allege the El Paso Defendants violated section 1 of the Sherman Act. (Id. at 65-66.) Plaintiffs request relief for claims six and seven as follows:
P. Determining and declaring that this action may be maintained as a class action on behalf of the Class;
Q. Determining and declaring that Defendants have engaged in unlawful contracts, combinations, and/or conspiracies constituting an unreasonable restraint of trade in violation of Section 1 of the Sherman Act;
R. Determining and declaring that each of the Defendants, their successors, assigns, subsidiaries, and transferees, and their respective officers, directors, agents, and employees, and all other persons acting or claiming to act on behalf of them or in concert with them, be perpetually enjoined and restrained from in any manner, directly or indirectly, continuing, maintaining, or renewing the combinations and conspiracies alleged herein;
S. Awarding treble the amount of actual damages determined to have been sustained by Plaintiffs and the Class as a result of the conduct of Defendants complained of herein as provided by law, and that judgment be entered against each Defendant for the amount so determined;
T. Awarding to Plaintiffs and the Class pre- and post-judgment interest to the extent allowed by law;
U. Awarding to Plaintiffs and the Class their attorneys' fees; and
V. Awarding to Plaintiffs and the Class costs of suit and such other and further relief as the Court may deem just and proper under the circumstances.
(Id. at 68.)
II. DEFENDANTS' MOTION TO DISMISS
Defendants[3] move this Court to dismiss Plaintiffs' first through fifth claim for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).[4] Defendants *1060 argue that the filed rate doctrine bars Plaintiffs' claims, or alternatively the claims are preempted by federal jurisdiction. Defendants argue the filed rate doctrine bars Plaintiffs' claims because Plaintiffs' damages and injunctive relief sought would require the Court to determine what a reasonable rate would have been absent Defendants' alleged misconduct, a regulatory task which Congress specifically delegated to FERC. Additionally, Defendants argue Plaintiffs' claims should be dismissed on the basis of federal preemption. Defendants argue that Plaintiffs' state claims relate to the field of wholesale sales and transportation of natural gas, an area exclusively occupied by federal law under the Natural Gas Act ("NGA").
Plaintiffs respond that the filed rate doctrine is inapplicable and does not bar Plaintiffs' claims. Plaintiffs argue that as end-run users, their purchase of natural gas is explicitly outside FERC's jurisdiction under the NGA, and therefore federal law does not pre-empt their claims nor does the filed rate doctrine bar their claims. Moreover, Plaintiffs argue that their damages calculation does not require the Court to assume a hypothetical rate for natural gas, and therefore the filed rate doctrine does not bar their damages calculation.
Also before this Court are the El Paso Defendants' Motion to Dismiss Plaintiffs' Claims Six and Seven (# Doc. # 207), and Defendants Sempra Energy ("Sempra"), Southern California Gas Company ("SoCal Gas") and San Diego Gas and Electricity Company's ("San Diego") Motion to Dismiss Plaintiffs' Claims Six and Seven (Doc. # 208). In both motions, Defendants argue the filed rate doctrine bars Plaintiffs' claims six and seven. As with claims one through five, Defendants argue that Plaintiffs' damages would require the Court to assume a hypothetical reasonable rate, an area of regulation within FERC's exclusive jurisdiction. Plaintiffs respond that the filed rate doctrine does not bar their claims because they are end-run users. Additionally, Plaintiffs argue their damage calculation would not require the Court to assume a hypothetical rate, and therefore the filed rate doctrine is inapplicable.
III. LEGAL STANDARD
In considering a motion to dismiss, "all well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the non-moving party." Wyler Summit Partnership v. Turner Broad. Sys., Inc., 135 F.3d 658, 661 (9th Cir.1998) (citation omitted). However, the *1061 Court does not necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations in the plaintiff's complaint. See Clegg v. Cult Awareness Network, 18 F.3d 752, 754-55 (9th Cir.1994). There is a strong presumption against dismissing an action for failure to state a claim. See Gilligan v. Jamco Dev. Corp., 108 F.3d 246, 249 (9th Cir.1997) (citation omitted). The issue is not whether Plaintiff ultimately will prevail, but whether he may offer evidence in support of his claims. See id. at 249 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). Consequently, the Court may not grant a motion to dismiss for failure to state a claim "unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); see also, Hicks v. Small, 69 F.3d 967, 969 (9th Cir.1995).
The liberal rules of notice pleading set forth in the Federal Rules of Civil Procedure do not require a plaintiff to set out in detail the facts supporting his claim. See Yamaguchi v. United States Dep't of the Air Farce, 109 F.3d 1475, 1481 (9th Cir.1997) (quoting Conley v. Gibson, 355 U.S. at 47, 78 S.Ct. 99). All the Rules require is a "short and plain statement" that adequately gives the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." Id. (citations and internal quotations omitted). Therefore, a plaintiff merely must plead sufficiently to "establish a basis for judgment against the defendant." Id. (citation omitted). Further, a claim is sufficient if it shows that the plaintiff is entitled to any relief which the court can grant, even if the complaint asserts the wrong legal theory or asks for improper relief. See United States v. Howell, 318 F.2d 162, 166 (9th Cir.1963).
IV. DISCUSSION
A. Background of Natural Gas Regulation
Under the Natural Gas Act ("NGA"), 15 U.S.C. §§ 717 et seq., FERC has the power to regulate "prices pipelines paid at the wellhead and the prices which pipelines could charge at the end-point." Id. (citing Assoc. Gas Distrib v. FERC, 824 F.2d 981, 993-94 (D.C.Cir.1987.)) The NGA, however did not extend to state-regulated monopoly arrangements to local customers. As the Supreme Court explained in General Motors Corporation v. Tracy, Congress did not intend to regulate all natural gas sales, with the NGA's passage:
When federal regulation of the natural gas industry finally began in 1938, Congress, too, clearly recognized the value of such state-regulated monopoly arrangements for the sale and distribution of natural gas directly to local consumers. Thus, § 1(b) of the NGA, 15 U.S.C. § 717(b), explicitly exempted "local distribution of natural gas" from federal regulation, even as the NGA authorized the Federal Power Commission (FPC) to begin regulating interstate pipelines. Congress's purpose in enacting the NGA was to fill the regulatory void created by the Court's earlier decisions prohibiting States from regulating interstate transportation and sales for resale of natural gas, while at the same time leaving undisturbed the recognized power of the States to regulate all in-state gas sales directly to consumers. Thus, the NGA "was drawn with meticulous regard for the continued exercise of state power, not to handicap or dilute it in any way;" "the scheme was one of cooperative action between federal and state agencies" to "protect consumers against exploitation at the hands of natural gas companies;" and "Congress" action . . . was an unequivocal recognition of the vital interests *1062 of the states and their people, consumers and industry alike, in the regulation of rates and service. . . .
519 U.S. 278, 291-92, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997) (citing Panhandle Eastern Pipe Line Co. v. Pub. Serv. Comm'n of Ind., 332 U.S. 507, 516-522, 68 S.Ct. 190, 92 L.Ed. 128 (1947)).
Congress began deregulating the natural gas industry with the passage of the Natural Gas Policy Act ("NGPA"), 15 U.S.C. § 3301-3432. The NGPA deregulated natural gas well-head[5] prices, and notably, first sales of natural gas. 15 U.S.C. § 3431(a); Order 644, 68 Fed.Reg. 66323. FERC explained the deregulation of first sales in Order 644:
Under the NGPA, first sales of natural gas are defined as any sale to an interstate or intrastate pipeline, LDC ["local distribution company"] or retail customer, or any sale in the chain of transactions prior to a sale to an interstate or intrastate pipeline or LDC or retail customer. Once such a sale is executed and the gas is in the possession of a pipeline, LDC, or retail customer, the chain is broken, and no subsequent sale, whether the sale is by the pipeline, or LDC, or by a subsequent purchaser of gas that has passed through the hands of a pipeline or LDC, can qualify under the general rule as a first sale of natural gas.[6]
Id.
Following the NGPA's passage, FERC issued Order 436. Tenneco Gas, 969, F.2d at 1193; Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, 50 Fed.Reg. 42408 (codified at 18 C.F.R. pt. 2, 157, 250, 284, 375, 381) ("Order 436"). In Order 436, FERC made several significant changes in the regulation of natural gas. FERC modified pipeline rate structures to permit the pipelines to recover the cost of their service. Additionally, FERC issued a clear statement of discrimination forbidding pipelines to discriminate between basis cost regarding their own gas and gas owned by other shippers. Finally FERC required pipelines to sell their capacity on a first-come, first-serve basis to any shipper, once that pipeline had received authorization from FERC to conduct open-access transportation. Tenneco Gas, 969 F.2d at 1193-94.
One of the principal devices FERC chose to carry out the open access program is the blanket transportation program. Order 436, 50 Fed.Reg. at 42410. *1063 Under the blanket transportation program, a pipeline is authorized, under FERC's authority conferred by section 7 of the NGA, to transport natural gas on a generic basis and need not return to FERC time and again when it desires to alter some of its services. Id. However, should a pipeline choose to avail itself of this "blanket" permission to provide transportation services, it must agree to establish itself as an open access carrier. Id.
In 1992, FERC culminated the deregulation of the natural gas market with FERC Order 636, "which required all interstate pipelines to `unbundle' their transportation services from their own natural gas sales and to provide common carriage service to buyers from other sources that wished to ship gas." Tracy, 519 U.S. at 284, 117 S.Ct. 811; Order 636, 57 Fed.Reg. 13267. Order 636 "issue[d] blanket sales certificates to pipelines so that they [could] offer unbundled firm and interruptible sales services at market-based rates." Order 636, 57 Fed.Reg. at 13270. In Order 636, FERC stated:
[T]he Commission believes that all segments of the natural gas industry are unduly disadvantaged by the current regulatory structure of the industry. The Commission must, therefore act under NGA section 5 to determine the just and reasonable, "rule, regulation, practice (and) contract(s)" to be "observed and in force."
Id. at 13277 (quoting NGA, 15 U.S.C).
Thus, at the time of the alleged misconduct at issue in this suit, the natural gas industry was largely deregulated. Final Report on Price Manipulation in W. Markets: Fact-Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices, Docket No. PA02-2-00, II-61 (Mar.2003). As this Court has previously noted, "[f]rom the time of the deregulation of the natural gas industry until after the California energy crisis, FERC regulation did not provide or enforce explicit guidelines or prohibitions regarding any of the conduct alleged in the Complaints." In re: W. States Wholesale Natural Gas Antitrust Litig., 368 F.Supp.2d 1110 (D.Nev.2005) (citing Price Manipulation in W. Markets, Docket No. PA02-2-000 at ES-6). However, although deregulated, FERC retained the right under the NGA to determine whether rates in the natural gas market were just and reasonable. Order 636, 57 Fed.Reg. at 13277; NGA, 15 U.S.C. § 717.
B. Claims 1 through 5
Defendants move this Court to dismiss Plaintiffs' first through fifth claims for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Defendants argue two alternative theories bar Plaintiffs' claims. First, Defendants argue the filed rate doctrine bars Plaintiffs' claims. Defendants claim that the monetary damages and injunctive relief Plaintiffs seek in this case would require the Court to speculate upon what rates would have been charged in the natural gas market absent the Defendants' alleged misconduct, thereby usurping a power Congress specifically delegated to FERC under the NGA. Defendants further argue that Plaintiffs' status as end-run users does not affect the filed rate doctrine. Defendants argue that even if the transactions in which Plaintiffs engaged were not within FERC's jurisdiction, the relief requested would require the Court to consider the reasonableness of interstate transportation rates, therefore intruding on FERC's jurisdiction. Alternatively, Defendants contend that Plaintiffs' state law claims are barred by the doctrine of field preemption. Defendants insist that Congress intended FERC to occupy the entire regulatory field of natural gas, and therefore Plaintiffs' state law claims are barred as a matter of law.
*1064 Plaintiffs respond that neither the filed rate doctrine, nor the theory of field preemption bar Plaintiffs' claims one through five. First, Plaintiffs argue that as end-run users of natural gas, the filed rate doctrine does not bar their claims. Specifically, Plaintiffs contend that FERC does not regulate first sales, including sales to end users, and therefore the rates which Plaintiffs challenge are not within FERC's jurisdiction and the filed rate doctrine does not apply. However, Plaintiffs maintain that if the first sale exclusion is inapplicable, the filed rate doctrine still does not bar their claims because FERC did not have the power to regulate the natural gas industry at the time of the alleged misconduct. Additionally, Plaintiffs argue that even if FERC had the power to regulate the natural gas industry, it chose not to. Therefore, the rates were not filed with FERC and the filed rate doctrine does not apply. Finally, Plaintiffs argue that as a matter of policy, FERC's failure to regulate Defendants' alleged misconduct compels the application of state-based anti-trust laws.
Plaintiffs further contend that as masters of their complaint, they have established that they do not intend to prove damages by assuming hypothetical rates contrary to rates approved or authorized by FERC. Specifically, Plaintiffs state:
Plaintiffs are the masters of their own damage theories, and their unequivocal disclaimer of reliance on any hypothetical just or reasonable rate neutralizes the Court's key concern in Western States III. Consistently with the market-based pricing system prescribed by the federal natural gas statutes, Plaintiffs will establish that the prices defendants would have charged in the absence of their collusive conduct would have been lower than those actually charged.
(Pls.' Opp'n at 31.) Plaintiffs argue that the proposed calculation would not require the Court to determine a just and reasonable rate per se, but rather, "[t]he trier of fact will only be asked to consider what prices would have resulted in a competitive market untainted by collusion." (Id.)
The NGA charges FERC with the statutory authority of ensuring all rates charged for the interstate sale of natural gas be just and reasonable. Section 717c(a) of the NGA provides:
All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful.
15 U.S.C. § 717c(a). In interpreting the scope of FERC's power under the NGA, the Supreme Court has held that, "[t]he authority to decide whether the rates are reasonable is vested by § 4 of the Act solely in the Commission." Ark. La. Gas Co. v. Hall, 453 U.S. 571, 573, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) (citing FPC v. Hope Natural Gas Co., 320 U.S. 591, 611, 64 S.Ct. 281, 88 L.Ed. 333 (1944)).
"The `filed rate doctrine' prohibits a federally regulated seller of natural gas from charging rates higher than those filed with the Federal Energy Regulatory Commission pursuant to the Natural Gas Act. . . ." Ark. La. Gas Co., 453 U.S. at 573, 101 S.Ct. 2925. Underlying the filed rate doctrine, "which forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority," are two basic principles. First, "no court may substitute its own judgment on reasonableness for the judgment of the Commission." Id. at 576, 101 S.Ct. 2925 (citing FPC, 320 U.S. at 611, 64 S.Ct. 281). Second, the *1065 authority to decide whether rates are reasonable is vested solely in FERC. Id. (citing FPC, 320 U.S. at 611, 64 S.Ct. 281). "In sum, the Act bars a regulated seller of natural gas from collecting a rate other than the one filed with the Commission and prevents the Commission itself from imposing a rate increase for gas already sold." Id. at 578, 101 S.Ct. 2925. The filed rate doctrine extends to the retroactive award of damages under state law. Id. at 580, 101 S.Ct. 2925. As the Supreme Court held in Ark. La. Gas Co.:
Congress here has granted exclusive authority over rate regulation to the Commission. In so doing, Congress withheld the authority to grant retroactive rate increases or to permit collection of a rate other than the one on filed.
Id. The United States Court of Appeals for the Ninth Circuit has noted that "[t]he doctrine applies to rates charged by railroads, natural gas companies, and other interstate operators over whom federal agencies have exclusive power to set rates." Transmission Agency of N. Cal. v. Sierra Pac. Power Co., 295 F.3d 918, 929 (9th Cir.2002).
The filed rate doctrine applies both to federal antitrust actions and to state law causes of action relating to rates established by federal agencies. To permit recovery under state law would allow a state court (or a federal court applying state law) to undermine the authority of a federal agency and would impermissibly contravene the Supremacy Clause.
County of Stanislaus v. Pac. Gas and Elec. Co., 114 F.3d 858, 863 (9th Cir.1997) (citing Ark. La. Gas, 453 U.S. at 580, 101 S.Ct. 2925). In Stanislaus, the plaintiffs, consumers of natural gas, sued the defendant, a public utility company, based on three types of antitrust claims: price fixing, market preclusion, and state antitrust claims. Id. The Ninth Circuit held that because FERC reviewed the price set between the plaintiffs and the defendant, the filed rate doctrine barred all claims in the case. Id. Specifically, the filed rate doctrine barred the calculation of damages because the Court would have to decide what the rate would have been absent the alleged misconduct. Id.
[A] claim for damages based on a filed rate would be too speculative, because it: "would require a showing that a hypothetical lower rate should and would have been adopted by [FERC]. Whether or not the agency would have actually approved a different rate was a question best left to the agency itself, rather than the courts."
Id. (quoting Cost Mgmt. Servs. v. Wash. Natural Gas Co., 99 F.3d 937, 944 (9th Cir.1996)).
In In re: Western States Wholesale Natural Gas Antitrust Litigation, 368 F.Supp.2d 1110 (D.Nev.2005), this Court recently addressed in another context the factual and legal background giving rise to this case. In that case, Plaintiff Texas-Ohio Energy Inc. ("Texas-Ohio") was a Texas corporation who "purchased natural gas in and/or for resale in California." Although Texas-Ohio was not itself an end-run purchaser of natural gas, it purported to represent both end-run and wholesale natural gas purchasers. Texas-Ohio brought Sherman Act and unfair competition claims against gas suppliers, based on alleged price manipulation, of which much the same behavior is alleged in the current matter. Id. at 1113. This Court held that the filed rate doctrine barred Plaintiffs' claims. Id. at 1116. Specifically,
[t]he determination of damages as requested by Texas-Ohio would require this Court to speculate upon what rates would have been charged in the natural gas market absent Defendants' alleged misconduct by assuming a hypothetical *1066 rate in violation of the filed rate doctrine.
Id. This Court did not, however, address the central issue presented by this case: whether the filed rate doctrine bars the claims of both wholesale gas purchasers and end-run users of natural gas.
In Texas-Ohio, this Court declined to address whether the filed rate doctrine would bar end-run consumers' claims because in Texas-Ohio, the named plaintiff was not an end-run user, but rather purported to represent a class which would include end-run users. The class in that case had not yet been certified. As a result, this Court declined to decide a question not before it, as doing so would amount to rendering an impermissible advisory opinion. In re MacNeil, 907 F.2d 903, 904 (9th Cir.1990).
Whether the filed rate doctrine bars the claims of end-run users of natural gas appears to be a question of first impression in the Ninth Circuit. Indeed, a review of relevant case law indicates that no federal appellate court has addressed the specific issue now before this Court. The only court in the Ninth Circuit to address this particular issue is the United States District Court for the Eastern District of California in the recent decision of E & J Gallo Winery v. EnCana Energy Services, 2005 WL 2435900 (E.D.Cal. Sept. 30, 2005). In Gallo, the plaintiffs, consumers of natural gas, sued the defendants alleging that they engaged in anti-competitive behavior in the natural gas market in violation of state and federal law. Id. The defendants moved the Court to dismiss the plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6), arguing that either the plaintiffs' claims were preempted or that the filed rate doctrine barred the plaintiffs' claims. Id. at *3. The Eastern District of California held that the filed rate doctrine did not bar the plaintiffs' claims nor were the plaintiffs' claims preempted by federal law, and therefore the court denied the defendants' motion to dismiss. The court held that the case law involving the filed rate doctrine compelled a "three-step inquiry to determine whether the filed rate doctrine applies in a give case. . . ." Id. at *14. The three-step inquiry suggested by the Eastern District is as follows:
First, the court must determine whether the action directly challenges the fairness of a rate paid or a tariff that has been filed. The second inquiry is whether the sales that are the subject of the action are jurisdictional; that is, whether the sales were wholesale sales in interstate commerce. If the first and second questions are answered affirmatively, the inquiry is essentially complete since only minimal exercise of regulatory control is sufficient to place the transaction within exclusive FERC jurisdiction. However, if the sale giving rise to the action is not jurisdictional; that is, it is a retail or intrastate sale, then the court must make a third inquiry to determine if the retail rate paid is pegged specifically to a rate or tariff that was filed with FERC and was either prospectively or retrospectively approved by FERC such that the court, in order to grant relief, must make a determination of the fairness of a wholesale rate or tariff.
Id. (internal citations omitted).
The court went on to explain the third part of the test, stating that it "focuses on the limited extent of FERC's jurisdiction over rate-setting." Id. (citing Carnation Co. v. Pac. Westbound Conference, 383 U.S. 213, 383 U.S. 932, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966)).
The filed rate doctrine will not apply where the defendant wishing to invoke the doctrine in the context of a dispute arising out of non-jurisdictional sales of *1067 natural gas cannot point with some precision to some rate or tariff that has been filed by FERC that is directly implicated by the plaintiffs' claim for relief.
Id. at *15. Gallo's rationale is under-scored by the courts' comments with regard federal preemption and the filed rate doctrine:
Since the filed rate doctrine applies to state law actions as federal preemption under the Supremacy Clause, invocation of preemption where the issue is whether a plaintiffs' claims interfere with FERC-determined tariffs or rates, is a mere repetition of the filed rate doctrine argument.
Id. at *10.
The Court in Gallo considered the central issue as "the extent of FERC's jurisdiction with respect to retail sales of natural gas." Id. at *20 (emphasis in original). According to the Gallo Court, "the validity of Defendants' argument turns on Defendants' contention that it does not matter that the sales to Gallo were retail sales and that the rates charged, although retail rates, cannot be examined for fairness without necessarily making prohibited inquiries into rates that are wholly within FERC jurisdiction." Id. at *17. Because the first sales at the center of the complaint were not within FERC's jurisdiction, the Gallo court held the filed rate doctrine inapplicable. Id. at *18. Specifically, the court stated, "[i]n this court's opinion, the difference between the legal status of the retail purchaser and the wholesale purchaser in their relationship to FERC oversight makes all the difference with respect to the filed rate doctrine." Id. at *22.
The Gallo court found persuasive the plaintiffs' arguments that to prove damages, it would not be necessary to determine what rates would have been in the wholesale gas market. Id. at *21. The Court held that to determine damages, it would be compelled to observe the privately maintained, privately published, for profit indices, none of which are regulated by FERC in a deregulated market context, and therefore doing so does not violate the filed rate doctrine. Id. Plaintiffs urge this Court to follow Gallo in the present matter as well as in reconsidering this Court's Texas-Ohio order.
The damages Plaintiffs seek require the Court to make a determination as to what a just and reasonable rate would have been in the wholesale natural gas market, thereby usurping a function Congress has explicitly assigned to FERC. See Ark. La. Gas Co., 453 U.S. at 582, 101 S.Ct. 2925; Texas-Ohio, 368 F.Supp.2d at 1116. In Ark. La. Gas Co., the Supreme Court stated that it would "undermine the congressional scheme of uniform rate regulation to allow a state court to award as damages a rate never filed with the Commission and thus never found to be reasonable within the meaning of the Act." 453 U.S. at 579, 101 S.Ct. 2925. The same is true in this case. Although the transactional rates at issue are for the first sales of natural gas, and thus outside of FERC's jurisdiction, the misconduct alleged in Plaintiffs' amended complaint centers on misconduct in the wholesale gas market which is within FERC's exclusive jurisdiction. Plaintiffs' damage calculation would require the Court to consider what the alleged misconduct's effect was on rates in the wholesale natural gas market, an action specifically prohibited under the filed rate doctrine.
Plaintiffs nevertheless argue the filed rate doctrine does not apply in this case because (1) FERC has no jurisdiction over end run sales, (2) FERC did not regulate the natural gas industry during the relevant time, (3) the differences between the natural gas and electricity markets distinguishes *1068 this case from Ninth Circuit authority applying the filed rate doctrine, and (4) the filed rate doctrine does not apply to market based rates.
First, Plaintiffs argue that FERC does not regulate first sales of natural gas, including sales to end users such as Plaintiffs, and therefore the filed rate doctrine does not bar their claims. Plaintiffs urge this Court to follow Gallo in this regard, wherein the court held that where FERC does not have jurisdiction over rates, the filed rate doctrine is inapplicable. Gallo, 2005 WL 2435900 at *15. Plaintiffs further state that this Court's opinion in Texas-Ohio was "premised on the applicability of the FERC regulation over the transactions in question." (Id. at 4.) Defendants respond that the filed rate doctrine applies to wholesale gas transactions and first sale transaction alike, as long as the damage calculation requires the court to determine rates governed by FERC.
The United States Court of Appeals for the Ninth Circuit has not predicated its application of the filed rate doctrine upon FERC's jurisdiction over the transaction at issue. The critical factor in the filed rate doctrine's application is the nature of the damages the plaintiff sought. For example, in Transmission Agency of Northern California v. Sierra Pacific Power Company, the plaintiff alleged breach of contract, tort, and property claims. 295 F.3d 918, 922 (9th Cir.2002) ("TANC"). The Ninth Circuit held that the filed rate doctrine barred the plaintiffs claims because the damage calculations would require the court to "assume how FERC would allocate access to interstate transmission capacity . . ." thereby usurping FERC's delegated jurisdiction. Id. at 931. That the filed rate doctrine's application left the plaintiffs claims unredressed did not affect the outcome because "[a]lthough this resolution may leave TANC's state law claims unredressed, such a circumstance is not an unlikely result of preemption." Id. at 931-32 (citing Ark. La. Gas Co. v. Hall, 453 U.S. at 579, 101 S.Ct. 2925).
In Public Utility District No. 1 of Grays Harbor County Washington v. IDACORP, Inc. the Ninth Circuit held that the filed rate doctrine barred the plaintiffs breach of contract claims. 379 F.3d 641, 650-51 (9th Cir.2004). Specifically, the Ninth Circuit held that "[t]he relief sought by [plaintiff] would require the court to set damages by assuming a hypothetical rate, the `fair value' in violation of the filed rate doctrine." Id. (citing TANC, 295 F.3d at 933). Likewise, in Public Utility District Number 1 of Snohomish County v. Dynegy Power Marketing, Inc., the Ninth Circuit held that the filed rate doctrine barred the plaintiff's state law based antitrust and consumer protection laws because the claims would require the Court to determine what electricity rates would have been in a competitive market absent the alleged misconduct. 384 F.3d 756, 761 (9th Cir.2004). The Ninth Circuit went on to state that "[t]his is the same determination as the `fair price' determination that we held was barred by preemption principles in Grays Harbor." Id. In TANC, Snohomish, and Grays Harbor, the Ninth Circuit did not predicate the application of the filed rate doctrine on whether FERC had jurisdiction over the transaction at issue in the claims, but whether the relief the plaintiff sought required the Court to question rates or allocations within FERC's exclusive jurisdiction.
Whether the filed rate doctrine is applicable here depends not on whether FERC has jurisdiction over first sales, which it does not, but whether the damages Plaintiffs seek require the Court to determine whether rates on the interstate gas market were reasonable. Plaintiffs must show damages for each of their claims one *1069 through five. See McGlinchy v. Shell Chem. Co., 845 F.2d 802, 811 (9th Cir.1988) (Sherman Act); Quelimane Co., Inc. v. Stewart Title Guar. Co., 19 Cal.4th 26, 77 Cal.Rptr.2d 709, 960 P.2d 513, 525 (1998) (California Unfair Competition Laws); Otworth v. S. Pac. Transp. Co., 166 Cal. App.3d 452, 212 Cal.Rptr. 743 (1985) (unjust enrichment). Plaintiffs also seek restitution (claim 4) and the imposition of a constructive trust (claim 5). With regard to injury and damages, Plaintiffs allege that they "were deprived of the benefits of freely set, competitive prices for natural gas." (Compl. at 60.) Specifying damages, Plaintiffs state:
Defendants unlawful conduct was the proximate cause of the artificial inflation of prices in the market for natural gas. On information and belief, such effect on the market price for natural gas was necessary, intended and foreseeable to Defendants when they acted unlawfully.
As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Class suffered damages and were injured in their business and property by purchasing natural gas at artificially high prices.
Id. at 61.
The unlawful conduct alleged by Plaintiffs include:
a. raising, fixing, stabilizing, and maintaining the price of natural in California;
b. engaging in wash trades in order to cause the price of natural gas to increase;
c. reporting false prices to the natural gas indices; and
d. discussing, exchanging, and decided among themselves, and acting in agreement to raise the price of natural gas sold in the State of California.
Id. at 61-62. The alleged anti-competitive behavior includes, "fixing prices on the spot market for natural gas, engaging in wash trades, false reporting to privately-owned price indices, netting, swaps, and churning." Id. at 17. The nature of the damages sought would require this Court to determine the just and reasonable price of natural gas absent the alleged misconduct which forms the basis of Plaintiffs' Complaint, and therefore would be a violation of the filed rate doctrine.
Plaintiffs further argue that even if the first sales exception is inapplicable, FERC did not regulate the natural gas industry at the time of the alleged misconduct, and therefore the filed rate doctrine does not apply. Defendants respond that in a market-based system FERC retained its duty to assure that rates in the market are just and reasonable under the NGA, and therefore the filed rate doctrine bars Plaintiffs' claims. This Court already has rejected Plaintiffs' argument. See Texas-Ohio, 368 F.Supp.2d at 1116-17. Relying on Grays Harbor, this Court held in Texas-Ohio that the filed rate doctrine applies to the natural gas market, despite the move to market based rates, because FERC retained the exclusive authority to determine whether wholesale natural gas rates are just and reasonable. Id. at 1117.
Plaintiffs' next argument that Grays Harbor and its progeny are distinguishable from the present case because that particular line of cases deals with the electricity market, and not the natural gas market. Plaintiffs maintain that in the electricity market, unlike the natural gas market, FERC retained significant control of the market thereby justifying federal preemption of state laws. Plaintiffs cite to this Court's prior order, In re Western States Wholesale Natural Gas Antitrust Litigation, 346 F.Supp.2d 1123 (D.Nev. 2004), for the proposition that the differences between the natural gas market and the electricity market make the recent Ninth Circuit decisions inapplicable to the present case. Plaintiffs argue that the *1070 Gallo court correctly held that the deregulation of the natural gas market renders the filed rate doctrine inapplicable. Gallo 2005 WL 2435900 at *21. Gallo concludes that because FERC did not set, approve, or regulate the rates published in the private indices, relying on those rates to calculate damages would not be an impermissible exercise in violation of the filed rate doctrine. Id.
This Court previously has recognized the distinct differences between the natural gas market and the electricity market. See In re W. States Wholesale Gas Antitrust Litig., 346 F.Supp.2d at 1139. Deregulation in the electricity market occurred in a substantially different manner from the deregulation of the natural gas market, although the deregulated structure of both markets proved vulnerable to price fluctuation spawning the 2000 energy crisis. Prior to the energy crisis that began in 2000, California restructured the generation, transmission, sale, and distribution of electricity to shift from a regulatory system to a market driven system of energy sales. Snohomish, 384 F.3d at 758-59. The result of the restructuring was the passage of Assembly Bill 1890 by the California legislature. Id. at 758. Bill 1890 provided for the creation of two non-governmental corporations, the Independent System Operator ("ISO") and the California Power Exchange ("PX"). Id. Both the ISO and the PX are organized under California law, but are governed by FERC. Id.
FERC did not govern the natural gas market with a similar structure prior to the 2000 energy crisis. FERC, Final Report on Price Manipulation in W. Markets: Fact-Finding Investigation of Potential Manipulation of Elec. and Natural Gas Prices, Docket No. PA02-2-00, II-61 (Mar.2003). The deregulation of the natural gas industry, which began with the passage of the NGPA, and culminated with the promulgation of FERC Order 636, resulted in the complete unbundling of transportation and natural gas, the issuance of blanket sales certificates to pipelines, and the total deregulation of first sales of natural gas. Order 636, 57 Fed.Reg. at 13270. As this Court explained in In re Western States Wholesale Gas Antitrust Litigation, "[f]rom the time of the deregulation of the natural gas industry until after the California energy crisis, FERC regulation did not provide or enforce explicit guidelines or prohibitions regarding any of the conduct alleged in the Complaints." 346 F.Supp.2d at 1139 (citing Price Manipulation in W. Markets, Docket No. PA02-2-000 at ES-6 ("Reliant's churning did not violate the blanket certificate under which it sold gas because Section 284.402 of the regulations contains no explicit guidelines or prohibitions.")).
These differences do not compel a different result in this case. Although the electricity and natural gas markets were subject to significantly different regulatory structures, at all relevant times FERC retained the statutory authority to ensure that all rates charged be just and reasonable in both markets. See 15 U.S.C. § 717c(a); 16 U.S.C. § 824e(a). In In re Western States Wholesale Gas Antitrust Litigation, this Court considered whether the NGA vests the federal courts with exclusive jurisdiction over lawsuits involving the natural gas industry, thereby justifying removal to federal court. 346 F.Supp.2d at 1126. This Court concluded that it did not have original jurisdiction under the NGA, and therefore there was no basis for removal. Id. at 1130-31. This Court further held that in enacting the NGA, Congress did not intend to preempt all state action, and therefore remand was appropriate. Id. at 1133.
As the Court explained, it did not consider the filed rate doctrine:

*1071 Unlike the doctrine of complete preemption, which may serve as a basis for federal jurisdiction, field preemption does not provide a federal cause of action sufficient to support removal. Even if the field preemption, conflict preemption, or the filed rate doctrine may be a central defense to this action, as federal defenses they are insufficient to support removal jurisdiction.
Id. at 1137 (citing Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987)) (internal citations omitted). Although this Court previously found FERC did not exercise its jurisdiction to establish complete or conflict preemption, that holding does not preclude the application of the filed rate doctrine. As in Grays Harbor, Snohomish, and Texas-Ohio, the damages Plaintiffs seek require the Court to make a determination as to what a just or reasonable rate would have been in the wholesale natural gas market, thereby usurping a function that Congress explicitly has assigned to FERC. See Texas-Ohio, 368 F.Supp.2d at 1116; Ark. La. Gas Co., 453 U.S. at 582, 101 S.Ct. 2925.
Plaintiffs' claims one through five are based on allegations that Defendants manipulated the wholesale gas market through a series of alleged misconduct including wash trades, churning actions, and manipulation of private price indices. (Am.Compl.) Even if the rates are filed on private indices, the Court still would have to determine which rate filed on the private index is a just and reasonable rate in the wholesale natural gas market, an action reserved for FERC under the NGA. See 15 U.S.C. § 717c(a); see also Grays Harbor, 379 F.3d at 651; Ark. La. Gas Co., 453 U.S. at 579, 101 S.Ct. 2925. Furthermore, a review of Ninth Circuit case law indicates that Plaintiffs' assertion that a rate may determined using a market-based damage analysis without violating the filed rate doctrine is incorrect. A component of the rates at issue are wholesale natural gas rates. To measure damages, the Court would be required to assess the corrosive effects of the alleged misconduct in the wholesale natural gas market, and consider what a just and reasonable rate would have been absent those corrosive effects-actions specifically prohibited by the filed rate doctrine. Even if it is market-based analysis, it is a market wholly within FERC's jurisdiction with regard to rate determination. At the most basic level, The Court would be required to consider what is and what is not a just rate, thereby usurping a delegated FERC function.
Finally, this Court has already rejected Plaintiffs' argument that the filed rate doctrine applies only when a filed rate exists:
The essential purpose of the filed rate doctrine is to protect the jurisdiction of a regulatory body that Congress has designated to determine whether rates charged, such as those in the natural gas market, are just and reasonable. Under the Natural Gas Act, FERC retains statutory authority over wholesale natural gas prices and therefore the filed rate doctrine applies even though FERC, in exercising its authority, chose to move toward a market-based system.
Texas-Ohio, 368 F.Supp.2d at 1116. As the Ninth Circuit Court of Appeals stated in Grays Harbor, "while market-based rates may not have historically been the type of rate envisioned by the filed rate doctrine, we conclude that they do not fall outside the purview of the doctrine." 379 F.3d at 651. Thus, Grays Harbor and its progeny demonstrate the filed rate doctrine applies to market-based rates.
For these reasons, this Court will grant Defendants's motion to dismiss Plaintiffs' claims for violation of the Sherman Act (claim 1), violation of the Cartwright Act (claim 2), violation of the California Business *1072 & Professions Code (claim 3), unjust enrichment (claim 4), and a constructive trust (claim 5).
C. Claims 6 and 7
Claim six of Plaintiffs' Amended Complaint alleges the El Paso Defendants and the Sempra Defendants entered into a conspiracy in the late 1990s to restrict natural gas pipeline capacity, thereby artificially inflating natural gas prices. (Am. Compl. at 42-43.) Specifically, Plaintiffs allege that senior executives representing the El Paso and Sempra Defendants met in a hotel room in Phoenix, Arizona on September 26, 1996, at which time they allegedly agreed to not compete in the natural gas market. (Id. at 43-44.) Plaintiffs allege that Defendants agreed to not build competitive pipelines, and to not oppose potentially anti-competitive mergers. (Id. at 44-45.) Plaintiffs claim that these action violated section 1 of the Sherman Act. (Id. at 64-65.) Plaintiffs' seventh claim for relief alleges the El Paso Defendants violated section 1 of the Sherman Act. (Id. at 65-66.) Specifically, Plaintiffs allege Defendants entered into a bid-rigging scheme to reduce competition in the natural gas market.
Plaintiffs request relief for claims six and seven as follows:
P. Determining and declaring that this action may be maintained as a class action on behalf of the Class;
Q. Determining and declaring that Defendants have engaged in unlawful contracts, combinations, and/or conspiracies constituting an unreasonable restraint of trade in violation of Section 1 of the Sherman Act;
R. Determining and declaring that each of the Defendants, their successors, assigns, subsidiaries, and transferees, and their respective officers, directors, agents, and employees, and all other persons acting or claiming to act on behalf of them or in concert with them, be perpetually enjoined and restrained from in any manner, directly or indirectly, continuing, maintaining, or renewing the combinations and conspiracies alleged herein;
S. Awarding treble the amount of actual damages determined to have been sustained by Plaintiffs and the Class as a result of the conduct of Defendants complained of herein as provided by law, and that judgment be entered against each Defendant for the amount so determined;
T. Awarding to Plaintiffs and the Class pre- and post-judgement interest to the extent allowed by law;
U. Awarding to Plaintiffs and the Class their attorneys' fees; and
V. Awarding to Plaintiffs and the Class costs of suit and such other and further relief as the Court may deem just and proper under the circumstances.
(Am. Compl. at 68.)
Defendants move this Court to grant summary judgment as to Plaintiffs' sixth and seventh claims. As with Plaintiffs' claims one through five, Defendants argue that the filed rate doctrine bars Plaintiffs' claims, or alternatively, federal law preempts Plaintiffs' claims. Specifically, the El Paso Defendants argue that although Plaintiffs' claims are based on conduct different from that plead in claims one through five, the filed rate doctrine also bars these claims. Specifically, Defendants argue the filed rate doctrine's application is dependant not upon the type of conduct alleged, but on the nature of the damages sought. Defendants thus argue the filed rate doctrine bars Plaintiffs' sixth and seventh claims, because they would require the Court to determine what rates in the wholesale natural gas market would have been absent Defendants' alleged misconduct.
*1073 Plaintiffs' respond that the filed rate doctrine does not bar Plaintiffs' claims, nor does federal law preempt Plaintiffs' claims. Plaintiffs do not dispute they would have to do the same damage calculation for claims six and seven as they would for claims one through five. In their briefing, Plaintiffs, treat all seven claims as if they should be analyzed the same with regard to the filed rate doctrine.
With regard to Plaintiffs' sixth claim, Plaintiffs allege that, "[t]he activities set forth above cause injury to Plaintiffs and the members of the Class by reducing the supply of natural gas and causing prices to be higher than such prices would have been in the absence of those activities." (Am. Compl. at 65.) With regard to Plaintiffs' seventh claim, Plaintiffs allege the Defendants alleged misconduct has "caused injury to Plaintiffs and the members of the Class by eliminating price competition for natural gas and causing the prices to be higher than such prices would have been in the absence of those activities." (Id. at 66.) Although Plaintiffs claims six and seven are predicated on different conduct than Plaintiffs' claims one through five, Plaintiffs again seek damages, that would require this Court to ascertain what the rate of natural gas would have been absent Defendants' alleged misconduct, an action explicitly reserved for FERC by Congress. Therefore, the Court's analysis with respect to Plaintiffs' claims one through five applies with equal force to Plaintiffs' sixth and seventh claims, and the filed rate doctrine bars both claims.
V. CONCLUSION
IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss the First Through Fifth Claims for Relief and Memorandum in Support of Motion to Dismiss (Doc. # 206) is hereby GRANTED, and Judgment is hereby entered in favor of Defendants and against Plaintiffs.
IT IS FURTHER ORDERED that the El Paso Defendants' (1) Joinder in Other Defendants' Motion to Dismiss Second Consolidated Amended Class Action Complaint and (2) Motion to Dismiss Sixth and Seventh Claims for Relief (Doc. # 207) and Defendants San Diego Gas and Electric Company, Sempra Energy, and Southern California Gas Company's (1) Joinder in Other Defendants' Motion to Dismiss Second Consolidated Amended Class Action Complaint and (2) Motion to Dismiss Sixth and Seventh Claims for Relief (Doc. # 208) are hereby GRANTED and Judgment is hereby entered in favor of Defendants and against Plaintiffs.
NOTES
[1] "A `wash trade' is a prearranged pair of trades of the same good between parties, resulting in no net change in ownership. It creates an illusion of a more liquid and active market and it helps bolster false trading revenue figures." Federal Energy Regulatory Commission, Commission Revoked Enron's Market-Based Rate Authority, Blanket Gas Certificates Terminated, (June 25, 2003), at http://www.ferc.gov/ press-ro om/pr-archives/2003/ 2003-2/06-25-03_enron.pdf.
[2] The term "netting agreements" refers to an agreement between parties to report the sale price of a particular transaction as a whole, averaging the lowest prices and the highest prices, thus creating an appearance of an overall higher market price in natural gas. See FERC, Final Report on Price Manipulation in W. Markets: Fact-Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices, No. PA02-2-00, II-7 (Mar.2003).
[3] Duke Energy Trading and Marketing, L.L.C.; Duke Energy North America, L.L.C.; Aquila Merchant Services, Inc.; Centerpoint; CMS Energy Resources Management Company; Coral Energy Resources L.P.; Dynegy Holding Co.; Dynegy Marketing & Trade; Dynegy Power Marketing; EnCana Corporation; WD Energy; Reliant Energy Services, Inc.; Reliant Energy, Inc.; Sempra Energy Trading Corp.; The Williams Companies, Inc.; Williams Power Company, Inc.; Xcel Energy, Inc.; and e prime, inc.
[4] Presently before this Court is Defendants' Motion to Dismiss the First Through Fifth Claims for Relief and Memorandum in Support of Motion to Dismiss (Doc. # 206) filed on July 22, 2005. Defendants El Paso Corporation, El Paso Tennessee Pipeline Company, El Paso Merchant-Gas, L.P., El Paso-Marketing, L.P., El Paso Merchant Energy Holding Company, El Paso Natural Gas Company, Mojave Pipeline Company, El Paso Mojave Pipeline Company, Mojave Pipeline Operating Company, and EPNG Mojave, Inc. ("the El Paso Defendants") filed El Paso Defendants' (1) Joinder in Other Defendants' Motion to Dismiss Second Consolidated Amended Class Action Complaint and (2) Motion to Dismiss Sixth and Seventh Claims for Relief (Doc. # 207) on July 22, 2005. Defendants San Diego Gas and Electric Company, Sempra Energy, and Southern California Gas Company filed (1) Joinder in Other Defendants' Motion to Dismiss Second Consolidated Amended Class Action Complaint and (2) Motion to Dismiss Sixth and Seventh Claims for Relief (Doc. # 208) on July 22, 2005. Plaintiffs filed a Consolidated Memorandum in Opposition to: (1) Defendant's Motion to Dismiss the First Through Fifth Claims for Relief; (2) Sempra Defendants' Joinder and Separate Motion to Dismiss the Sixth and Seventh Claims for Relief; and (3) El Paso Defendants' Joinder and Separate Motion to Dismiss the Sixth and Seventh Claims for Relief (Doc. # 214) ("Pls.' Opp'n") on August 16, 2005. Plaintiffs also filed an Addendum (Doc. # 220) ("Addendum") on August 19, 2005.

Defendants filed Defendants' Reply Memorandum in Support of the Rule 12 Motion to Dismiss Fairhaven, Utility Service and Abelman Glass (Doc. # 223) on September 2, 2005, to which Defendants Sempra Energy, Southern California Gas Company, and San Diego Gas and Electricity Company filed a Joinder and Reply in Support of Motion to Dismiss Sixth Claim for Relief (Doc. # 224) on August 31, 2005. The El Paso Defendants' filed (1) Joinder in Other Defendants' Reply in Support of Motion to Dismiss Second Consolidated Amended Class action Complaint and (2) Reply in Support of Motion to Dismiss Sixth and Seventh Claims for Relief (Doc. # 225) on September 2, 2005.
[5] "Wellhead sales" are defined as any sale of natural gas involving the actual transfer of the gas from seller to buyer, where the gas is at any stage of its movement from wellhead to ultimate consumption, and where the object of the sale is the eventual resale of the gas for public consumption.

73 A.L.R. Fed. 804 n. 12.
[6] The NGPA defines a "first sale" as follows:

(21) First Sale
(A) General rule
The term "first sale" means any sale of any volume of natural gas 
(I) to any interstate pipeline or intrastate pipeline;
(ii) to any local distribution company;
(iii) to any person for use by such person;
(iv) which precedes any sale described in clauses (I), (ii), or
(iii); and
(v) which precedes or follows any sale described in clauses (I), (ii), (iii), or (iv) and is defined by the Commission as a first sale in order to prevent circumvention of any maximum lawful price established under this chapter.
(B) Certain sales not included
Clauses (I), (ii), (iii), or (iv) of subparagraph (A) shall not include the sale of any volume of natural gas by any interstate pipeline, intrastate pipeline, or local distribution company, or any affiliate thereof, unless such sale is attributable to volumes of natural gas produced by such interstate pipeline, intrastate pipeline, or local distribution company, or any affiliate thereof.
15 U.S.C. § 3416(21).